**Certiorari Denied, June 26, 2014, No. 34,704**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number:  2014-NMCA-072**

**Filing Date:  April 14, 2014**

**Docket No. 32,260**

**GERALD MAESE and JACQUELINE MAESE,**

> **Plaintiffs-Appellees,**

**v.**

**DAVID GARRETT and WELLS FARGO**
**ADVISORS, LLC,**

> **Defendants-Appellants.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Theresa M. Baca, District Judge**

Bryan L. Query, P.A.
Bryan L. Query
Albuquerque, NM

for Appellees

Windle Hood Alley Norton Brittain
& Jay, LLP
Joseph L. Hood, Jr.
El Paso, TX

for Appellants

**OPINION**

**FRY, Judge.**

**{1}**     The formal opinion filed in this case on April 10, 2014, is hereby withdrawn, and this opinion is substituted in its place.

**{2}** Plaintiff brought suit against Defendants to recover taxes, penalties, and interest Plaintiff incurred in connection with the partial surrender of a deferred variable annuity.[1] Plaintiff alleged that erroneous financial advice he received from Defendants caused him to incur the additional tax liability. The district court agreed with Plaintiff and awarded him damages. Defendants argue on appeal that (1) Plaintiff did not establish that he suffered a compensable loss as a result of the erroneous financial advice; and (2) the Unfair Practices Act (UPA), NMSA 1978, §§ 57-12-1 to -26 (1967, as amended through 2009), does not apply to this case because the transaction at issue did not involve the sale of goods or services. We conclude that Plaintiff established that he suffered a compensable loss by way of the tax liability he incurred due to the misrepresentation. We further conclude that the UPA applied to Defendants' financial advising services. Accordingly, we affirm.

**BACKGROUND**

**{3}** Defendants do not challenge the following facts found by the district court. Defendants provided financial services to Plaintiff, which included management of Plaintiff's securities account. At all material times, Defendant David Garrett had primary financial advisory responsibility over Plaintiff's account. At Garrett's recommendation, Plaintiff purchased a deferred variable annuity. Plaintiff invested approximately $175,000 in after-tax dollars in the annuity. By October 2007, Plaintiff's contributions and investment gains in the annuity totaled over $300,000.

**{4}** Around this time, Plaintiff purchased an office building and needed approximately $140,000 to complete remodeling and to purchase equipment for his dental practice. Plaintiff contacted Garrett regarding whether he could withdraw monies from the annuity tax free and without incurring penalties in order to fund the remodeling. Garrett erroneously advised Plaintiff that because the contributions made to the annuity were "after-tax" dollars, Plaintiff could withdraw an amount equal to the amounts he had contributed to the annuity without incurring any additional tax liability. Plaintiff asked Garrett on one or two other occasions whether this advice was correct and was assured by Garrett that the amount he wanted to withdraw from the annuity was "well within" the amount he could withdraw tax free. Based on these representations, Plaintiff decided to withdraw the money needed to complete the remodeling from the annuity.

**{5}** Garrett's advice was incorrect, however, because withdrawals from the annuity would first be considered withdrawals on gains from investments, not on amounts contributed, and they would therefore be subject to income tax. The advice was also incorrect because any withdrawals from the annuity before Plaintiff reached age fifty-nine-and-a-half were subject to an early withdrawal penalty equal to ten percent of the investment

---

[1]For convenience, we refer to Gerald Maese throughout this opinion as Plaintiff. Although both Gerald Maese and his wife, Jacqueline, suffered damages, Gerald appears, from the evidence, to be the active participant in the events that transpired.

gains withdrawn from the account. Thus, after Plaintiff withdrew money from the annuity, Genworth, the annuity company, filed an IRS form indicating that the entire amount of the withdrawal was taxable income. Plaintiff did not receive the IRS form filed by Genworth and accordingly did not report the withdrawn amount on his income tax returns. Seventeen months later, the IRS notified Plaintiff that it was proposing to increase his tax liability by the amount withdrawn, though it was later modified to a slightly lower amount. As a result of the adjustment, Plaintiff was assessed a total of $77,623.06 in additional state and federal income taxes, interest, and penalties.

**{6}** After Plaintiff received the IRS notice, he met with Garrett and his accountant to determine why Genworth had reported the money as taxable. The parties spoke to a Genworth representative over the phone during the meeting, who explained why the withdrawal was properly reported to the IRS. After the meeting, Plaintiff and his accountant contacted the IRS to explore whether the IRS would abate the increased taxes, interest, and penalties. The IRS initially denied Plaintiff's request for abatement but later indicated that if Plaintiff could secure confirmation from Defendants that he had relied on erroneous information in withdrawing the money, the IRS would look more favorably on eliminating a portion of the penalties. Plaintiff contacted Defendants to request such a written confirmation. Defendants declined to provide one.

**{7}** Plaintiff brought suit against Defendants in district court. Following a two-day bench trial, the district court found in favor of Plaintiff on his claims of misrepresentation, breach of fiduciary duty, and violation of the UPA. The district court entered a judgment awarding Plaintiff $77,623 for the additional tax liability, plus attorney fees and costs. Defendants appeal.

## DISCUSSION

### I. The District Court's Damages Award Was Correct

**{8}** Plaintiff withdrew approximately $142,000 from the annuity. Of that amount, $128,599 was attributable to investment gains realized by Plaintiff, against which $77,623 was levied in taxes, interest, and penalties. Defendants characterize the approximately $50,976 difference between the taxable investment gains and the tax liability as a "net investment gain" and argue that because Plaintiff realized a net investment gain, he did not sustain a compensable loss as a result of Garrett's misrepresentations regarding the tax consequences of the transaction. Defendants further argue that because they were not responsible for the interest and penalties the IRS assessed against Plaintiff, they should not be liable for those damages. We discuss these issues in turn. Because the parties do not dispute the facts, these issues raise questions of law, which we review de novo. *Team Specialty Prods., Inc. v. N.M. Taxation & Revenue Dep't*, 2005-NMCA-020, ¶ 8, 137 N.M. 50, 107 P.3d 4.

### A. Plaintiff Suffered a Compensable Loss

**{9}**     In arguing that Plaintiff did not suffer a compensable loss, Defendants rely largely on cases holding that plaintiffs are generally precluded from recovering tax liabilities as damages because they have an obligation to pay taxes regardless of whether their failure to do so resulted from negligent financial advice.  *See DCD Programs, Ltd. v. Leighton*, 90 F.3d 1442, 1449 (9th Cir. 1996) (denying recovery of back taxes because the plaintiffs' "tax liabilities resulted from the ineluctable requirements of the Internal Revenue Code, rather than from any wrongful conduct on the part of the defendants")*; O'Bryan v. Ashland*, 2006 SD 56, ¶ 1, 717 N.W.2d 632, 633 ("In ordinary circumstances, when a tax advisor's negligence leads to an underpayment of tax, the taxpayer cannot recover as damages the tax deficiency itself because the tax liability arose not from the negligent advice, but from the ongoing obligation to pay the tax.").  Defendants do not argue that these cases represent an absolute bar to Plaintiff's recovery.  Rather, Defendants argue that in addition to Plaintiff establishing the amount of tax liability incurred due to the misrepresentation, Plaintiff was required to also prove (1) that if Plaintiff had delayed his withdrawal from the annuity until sometime in the future, his tax liability would have been less; and (2) that investment gains in the annuity in the future would have been equal to the gains Plaintiff realized at the time of the actual withdrawal.  In other words, as we understand the argument, Plaintiff had to prove that future market fluctuations would not have negatively impacted Plaintiff's investment.  Thus, Defendants argue that in the absence of such evidence, the district court's judgment results in a windfall: "[Plaintiff] not only received the benefit of a substantial investment gain that [he] would not otherwise have realized, [he is] also relieved of the obligation to pay taxes on that gain—taxes that every other investor would be obligated to pay."

**{10}**     As explained in more detail below, we are unpersuaded by Defendants' argument for two reasons.  First, we conclude that Plaintiff met his burden to establish his damages with reasonable certainty when he established that he would not have incurred the additional tax liability but for Defendants' erroneous advice. Second, to the extent Defendants argue that Plaintiff benefitted from the misrepresentation, we conclude that it was Defendants' burden to prove what effect the tax implications or investment impact of any future withdrawal should have on Plaintiff's ability to recover damages resulting from the tax liability incurred on the actual withdrawal.

**{11}**     We begin by examining the proper measure of damages in cases where negligent financial or tax advice has led to a plaintiff incurring additional tax liability.  As *O'Bryan* and *Leighton* recognize, even where a plaintiff has received negligent tax advice, the plaintiff cannot recover as damages an otherwise valid tax obligation.  *O'Bryan*, 2006 SD 56, ¶ 1, 717 N.W.2d at 633; *see Leighton*, 90 F.3d at 1449.  However, these cases and others also stand for the proposition that where the tax liability is caused by the negligent advice or wrongful conduct and would not have been incurred *but for* the negligent advice or wrongful conduct, there is no prohibition on the recovery of the tax liability.  *See Eckert Cold Storage, Inc. v. Behl*, 943 F. Supp. 1230, 1234 (E.D. Cal. 1996) (stating that "plaintiffs may be entitled to damages due to the tax liability, if they can prove that this liability was caused by [the defendant's] negligent or fraudulent advice and would not otherwise have been incurred");

4

*Deloitte, Haskins & Sells v. Green*, 403 S.E.2d 818, 820 (Ga. Ct. App. 1991) (concluding that where evidence showed that the plaintiff would not have incurred the tax liability but for the negligent advice, the plaintiff was entitled to claim as damages the tax liability, not as "[a] tax he lawfully paid, but for his loss in having sold the business with unanticipated tax consequences"); *Whitney v. Buttrick*, 376 N.W.2d 274, 279 (Minn. Ct. App. 1985) (holding that the plaintiff should have been allowed to argue the tax liability resulting from the attorney's negligent advice as an element of damages).

**{12}**    Under these circumstances, we agree with the court in *Lien v. McGladrey & Pullen* that the proper measure of damages should be the difference between what the plaintiff would have owed absent the negligence and what the plaintiff paid because of the negligence, plus incidental damages.  509 N.W.2d 421, 426 (S.D. 1993); s*ee also Eckert Cold Storage*, 943 F. Supp. at 1234 ("[The] plaintiffs' recovery must be limited to losses proximately caused by [the defendant's] alleged misrepresentations: the damages awarded should place [the] plaintiffs in the position they would have occupied had the misrepresentations not occurred.").  We believe that this measure of damages most closely comports with the purpose of compensatory damages, which is to "fully compensate a plaintiff, or restore [the] plaintiff to his [or her] rightful position."  *McNeill v. Burlington Res. Oil & Gas Co.*, 2007-NMCA-024, ¶ 28, 141 N.M. 212, 153 P.3d 46, *aff'd*, 2008-NMSC-022, 143 N.M. 740, 182 P.3d 121.

**{13}**    In this case, Plaintiff's testimony that he would not have chosen to withdraw monies from the annuity but for Garrett's misrepresentation that the withdrawal would be tax free was sufficient to establish that the full amount of the tax liability was avoidable and would not have been incurred but for Garrett's advice.  *Cf. Eckert Cold Storage*, 943 F. Supp. at 1234 (stating "that an accountant 'causes' its client to incur tax liability when its advice induces the client to earn taxable income").  Thus, we conclude that where Plaintiff established that he incurred an additional $77,623 in taxes, interest, and penalties due to the misrepresentation by Defendants, he met his "burden of proving the existence of injuries and resulting damage with reasonable certainty." *Sanchez v. Martinez*, 1982-NMCA-168, ¶ 20, 99 N.M. 66, 653 P.2d 897; *see Green*, 403 S.E.2d at 820 (stating that the plaintiff met his burden to prove he incurred damages where he submitted evidence that he would not have incurred the tax liability if it had not been for the defendant's negligent tax advice).

**{14}**    In so concluding, we reject Defendants' assertion that Plaintiff was required to prove that a future withdrawal would have lessened or avoided the amount of tax liability incurred and that the investment gains at the time of a speculative future withdrawal would have matched or exceeded the gain realized at the time of the actual withdrawal.  While we acknowledge that it is never the purpose of compensatory damages to allow a plaintiff to profit from his or her loss, *see McNeill*, 2007-NMCA-024, ¶ 28, in this case, the burden Defendants seek to place upon Plaintiff was their own.  In arguing that Plaintiff benefitted from Garrett's misrepresentation, Defendants are essentially arguing that whatever damages Plaintiff incurred were offset by the benefit Plaintiff received due to the relative strength of the stock market at the time of the withdrawal.  The burden of proving that a tortfeasor's

5

negligence benefitted the plaintiff is generally the defendant's. *See Lovelace Med. Ctr. v. Mendez*, 1991-NMSC-002, ¶ 41, 111 N.M. 336, 805 P.2d 603 (" 'When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.' " (quoting Restatement (Second) of Torts, § 920 (1979)); *McGinnis v. Honeywell, Inc.*, 1990-NMSC-043, ¶ 22, 110 N.M. 1, 791 P.2d 452 (explaining that it is the defendant's burden to prove mitigation of damages); *see also O'Bryan*, 717 N.W.2d at 639 (stating that the "defendants should be permitted to come forward with evidence of benefit from the [attorney's erroneous tax advice] that could be applied to reduce the plaintiff's recovery" (internal quotation marks and citation omitted)). Thus, it was Defendants' burden to prove whether and to what extent Plaintiff was benefitted by Defendants' negligence. Here, the district court rejected Defendants' proposed findings of fact regarding alleged benefits Plaintiff received due to the transaction, indicating that it determined that there was insufficient evidence presented to find that the investment gains and tax implications of an indeterminate withdrawal in the future necessitated reduction of Plaintiff's damages award. Thus, Defendants did not meet their burden to offset Plaintiff's damages award.

**B.      Interest and Penalties Were Properly Included in the Damages Award**

{15}      Finally, although we have already concluded that the district court properly included interest incurred by Plaintiff in the damages award, we briefly address Defendants' argument that Plaintiff is not entitled to recover the penalties and interest associated with the tax liability because Defendants were not the cause of Plaintiff's failure to timely pay the taxes. *See Topmiller v. Cain*, 1983-NMCA-005, ¶ 19, 99 N.M. 311, 657 P.2d 638 ("Compensatory damages are recoverable if they proximately result from a violation of a legally-recognized right of the person seeking the damages[.]" (internal quotation marks and citation omitted)). The district court found that Plaintiff was not notified that Genworth reported the amount to the IRS as taxable income until the IRS sent Plaintiff a notification letter seventeen months after he withdrew from the annuity. The IRS sought an early withdrawal penalty tax of $12,860, an accuracy penalty of $12,860, and interest payments in the amount of $4,179 and $262. The district court found that after Plaintiff received the notification, he met with Garrett. During that meeting, Garrett called a Genworth representative, who explained to Garrett and Plaintiff why the withdrawal was properly reported as taxable income. Defendants, however, subsequently refused to aid Plaintiff in obtaining a penalty waiver after Plaintiff requested that Defendants provide the IRS with confirmation that they had provided erroneous advice. These findings properly support the district court's conclusion that the interest and penalties resulted from Defendants' misrepresentation both because the penalties and interest were a natural consequence of the misrepresentation and because Defendants refused to assist Plaintiff in obtaining a penalty waiver. Defendants do not challenge the sufficiency of the evidence supporting these findings, and we therefore affirm the district court's inclusion of the interest and penalties in the damages award on this basis as well. *See Griffin v. Guadalupe Med. Ctr., Inc.*, 1997-NMCA-012, ¶ 7, 123 N.M. 60, 933 P.2d 859 ("The trial court's findings not properly attacked are conclusive on appeal.").

6

## II.     Unfair Practices Act

**{16}**     Defendants argue that the district court erred in concluding that the UPA applied under the facts of this case because the transaction at issue did not involve the sale of a good or service.  More specifically, Defendants argue that Plaintiff never purchased goods or services from Defendants because Plaintiff did not pay Defendants for the incorrect financial advice or for the withdrawal from the annuity.  Defendants also argue that to the extent the representations were found to be in connection with the purchase of the annuity four years earlier, the annuity—as a security—cannot be considered a "good" and is therefore not covered by the UPA.  The question of whether the UPA applies in this case is a question of statutory construction that we review de novo. *Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 22, 147 N.M. 583, 227 P.3d 73.

**{17}**     "The UPA provides that unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."  *Hicks v. Eller*, 2012-NMCA-061, ¶ 17, 280 P.3d 304 (alteration, internal quotation marks, and citation omitted).  The three essential elements of a UPA claim are:

> (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

*Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 5, 142 N.M. 437, 166 P.3d 1091; *see* § 57-12-2(D).  Because Defendants do not challenge the district court's findings that the statements constituted misrepresentations or that the misrepresentations deceived or tended to deceive Plaintiff, we are concerned here with the second element: whether the misrepresentation was in connection with the sale of goods or services. *See Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 17, 125 N.M. 748, 965 P.2d 332 ("The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services.").  Accordingly, we are not faced with the question of whether merely incompetent financial advice can be construed as a deceitful misrepresentation.

**{18}**     Consistent with the remedial purpose of the UPA and the corresponding liberal interpretation we accord to its provisions, our prior decisions have utilized a broad construction of the element "in connection with the sale of goods or services." *Lohman,* 2007-NMCA-100, ¶¶ 5, 42 (internal quotation marks and citation omitted); *State ex rel. Stratton v. Gurley Motor Co.*, 1987-NMCA-063, ¶ 27, 105 N.M. 803, 737 P.2d 1180 ("Because the Unfair Practices Act constitutes remedial legislation, we interpret the provisions of this Act liberally to facilitate and accomplish its purposes and intent.").  In *Lohman*, we stated that "[t]he conjunctive phrase 'in connection with' seems designed to

7

encompass a broad array of commercial relationships." *Id.* ¶ 21. We have also rejected the argument that this element can only be satisfied upon a showing that the defendant made a misrepresentation in the course of selling a product or services to the plaintiff. *Id.* ¶ 30 ("[The UPA] does [not] require a misrepresentation *in the course of* a sale between [the] plaintiff and [the] defendant; it merely requires that a misrepresentation be 'made *in connection with* the sale . . . of goods [or services]' generally." (omissions in original)).

**{19}** Thus, given our liberal construction of the provisions of the UPA, we are unpersuaded by Defendants' argument that the UPA does not apply because Plaintiff did not specifically compensate Defendants for the advice or the withdrawal from the annuity. The district court found that Defendants were compensated for the sale of financial products sold to Plaintiff and for Garrett's provision of financial advising services. Defendants do not attack these findings, and it is sufficient for the UPA that Defendants received compensation for the goods and services provided to Plaintiff, even if the compensation was received at a time prior to the misrepresentation, provided that it occurred in connection with the commercial relationship for which Defendants were compensated. *See id.* ¶ 32 (stating that the UPA merely "contemplates a plaintiff who seeks or acquires goods or services *and* a defendant who provides goods or services" (internal quotation marks and citation omitted)). Garrett's misrepresentation occurred in the context of this broader commercial relationship, which included the provision of financial advice regarding investments Plaintiff made through Defendants. It is immaterial that Plaintiff did not specifically compensate Defendants for financial advising services where Defendants received compensation from third parties (e.g., from Genworth for the annuity in question) for investment advice that led to Plaintiff's purchase of their products. *Hicks*, 2012-NMCA-061, ¶ 20 ("We understand [*Lohman*] to mean that the plaintiff does not necessarily have to purchase the product from the defendant, but that somewhere along the purchasing chain, the [plaintiff] did purchase an item that was at some point sold by the defendant.").

**{20}** Defendants argue that, even if they provided financial advising services to Plaintiff, those services were not the main purpose of their commercial relationship with Plaintiff. Instead, they contend that the primary purpose was the sale of the Genworth annuity. We are not persuaded. In hiring Defendants to manage his securities account, Plaintiff was implicitly seeking Defendants' advice about various investment products and, ultimately, their advice about the benefits of the annuity at issue. Defendants' advice about the tax consequences of withdrawing funds from the annuity was interrelated with the overall investment advice that Defendants provided and that Plaintiff purchased in the course of their business relationship.

**{21}** We need not resolve Defendants' second argument that the UPA does not apply because securities do not constitute "goods" under the UPA. Defendants note a number of cases supporting the assertion that consumer protection statutes do not apply to securities transactions. *See, e.g.*, *Bowen v. Ziasun Techs., Inc.*, 11 Cal. Rptr. 3d 522, 529-32 (Ct. App. 2004) (holding that securities transactions are not covered under California's consumer protection statute); *Crowell v. Morgan, Stanley, Dean Witter Servs. Co.*, 87 F. Supp. 2d

8

1287, 1294-95 (S.D. Fla. 2000) (holding that securities transactions are not within the scope of Florida's deceptive trade practices act). However, these cases are distinguishable. The majority of these cases are securities fraud cases in which the security transaction itself was the basis of the plaintiff's complaint. *See Skinner v. E.F. Hutton & Co.*, 333 S.E.2d 236 (N.C. 1985). In this case, Garrett's misrepresentative financial advice formed the basis of Plaintiff's complaint. Defendants cite no authority that financial advisors are exempt from consumer protection statutes. Nor do Defendants argue that financial advising does not constitute a "service" under the UPA. *See McElhannon v. Ford*, 2003-NMCA-091, ¶ 17, 134 N.M. 124, 73 P.3d 827 ("The word 'services' is generally understood to mean work done by one person at the request of another." (internal quotation marks and citation omitted)). Thus, even if we were to conclude that securities transactions are not "goods" under the UPA, it would not lead to the conclusion that the UPA is inapplicable to this case. *See* § 57-12-2(D) (defining an unfair or deceptive trade practice as one "made in connection with the sale . . . of goods or services").

**CONCLUSION**

**{22}**    For the foregoing reasons, we affirm the district court's judgment.

**{23}**    **IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Judge**

**I CONCUR:**

_____
**J. MILES HANISEE, Judge**

**JONATHAN B. SUTIN, Judge (concurring in part and dissenting in part).**

**SUTIN, Judge (concurring in part and dissenting in part).**

**{24}**    I concur in all but the majority's UPA analysis and holding, with respect to which, I respectfully dissent.

**{25}**    The tax advice at issue related to a variable annuity. The advice was not given to induce or consummate a sale of anything. There exists no evidence that the advice was given for any compensation or income growing out of the sale of the variable annuity. Furthermore, the advice was given long after the sale of the variable annuity.

**{26}**    The tax advice unquestionably was not a "good." It was not given in connection with the sale of goods. The variable annuity at issue is a security or is in the nature of a security.

9

*See Sec. & Exch. Comm'n v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 66, 71 (1959) (holding that companies who offered their annuity contracts to the public were subject to federal securities laws); *Gilmore v. Mony Life Ins. Co. of Am.*, 165 F. Supp. 2d 1276, 1280 (M.D. Ala. 2001) (observing that the Supreme Court, in *Securities & Exchange Commission*, held that variable annuities are securities subject to the commission's registration requirements); *N.M. Life Ins. Guar. Ass'n v. Quinn & Co.*, 1991-NMSC-036, ¶ 15 n.5, 111 N.M. 750, 809 P.2d 1278 (adopting federal precedent in construing the New Mexico definition of "security"). A variable annuity, like a security, does not come within the ambit of "goods." *See Estate of Migliaccio v. Midland Nat'l Life Ins. Co.*, 436 F. Supp. 2d 1095, 1108-09 (C.D. Cal. 2006) (holding that, under California Consumers Legal Remedies Act, annuities are not goods or services); *State ex rel. McGraw v. Bear, Stearns & Co.*, 618 S.E.2d 582, 585-86 (W. Va. 2005) (stating that securities are "instruments" not "goods" in the context of West Virginia's consumer protection statute); *cf. Cottonwood Fin. Ltd. v. Cash Store Fin. Servs., Inc.*, 778 F. Supp. 2d 726, 738 (N.D. Tex. 2011) ("Stocks, like other securities, are not goods."); *Hand v. Dean Witter Reynolds, Inc.*, 889 S.W.2d 483, 486-87, 496-97 (Tex. App. 1994) (holding that intangibles, including commodity option contracts, are not "goods" as that term is defined by the Texas Deceptive Trade Practices—Consumer Protection Act).

**{27}**    The majority hinges its UPA applicability on an analysis that connects the tax advice to the annuity transaction. Majority Op. ¶¶ 18-19.[2] There is no connection to be had. The tax advice was not an independent sale of services. Nor was it given in connection with a sale of a service. Nor was it incidental to the annuity purchase. The advice at best was simply related to the Plaintiff's ownership of the variable annuity and Plaintiff's plan to surrender part of the annuity to use the funds for another investment. Even if some continuing relationship between the advice and the annuity transaction could be found, the advice was so incidental and remote that it cannot come within the UPA. *See McGraw*, 618 S.E.2d at 586 ("Clearly, the service of providing investment advice and analyses is so ancillary or subsidiary to the buying and selling of securities, it is only reasonable to conclude that such conduct does not fall within the scope of the consumer-type transactions governed by the consumer protection act."); *see generally Hand*, 889 S.W.2d at 499

---

[2]The district court adopted verbatim Plaintiff's requested finding that "Defendant . . . Garrett received financial compensation in connection with the sale of financial products" sold to Plaintiff and for Garrett's provision of "financial advisor services[.]" The majority reads this finding to mean that "Defendants received compensation for the goods and services provided to Plaintiff[.]" Majority Op. ¶ 18. I see no basis on which to conclude from the district court's broad, if not ambiguous, finding that the court found that Defendants received compensation in April 2002 (when the annuity purchase occurred) for any tax advice that might happen to be given some time in the future, here, five and one-half years later, in or about October 2007. The majority points out that Defendants did not specifically attack this unclear finding. Majority Op. ¶ 18. In my view, reliance on the finding creates bad law—expansion of the UPA beyond its intended limit.

(recognizing that to some extent all transactions involve human service, the cost of which is included in the price of the transaction; however, where the acquisition of that service is not the main objective of the transaction, consumer protection laws do not apply); *cf. Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160, 1166 (10th Cir. 2011) (distinguishing investment advisers, who give advice for its own sake, who are specifically hired to do so, and for which advice the adviser receives special compensation from broker-dealers who receive brokerage commissions for transactions involving incidental investment advice, and recognizing that advice about the value of securities, the advisability of purchasing or selling securities, is solely incidental to the conduct of a broker-dealer's business).  Any such incidental, remote relationship between the purchase of the annuity and the tax advice given years later related to a partial surrender of the annuity should not bring mere tax advice within the scope of the UPA.

**{28}**    I am not aware of any New Mexico authority or a reasoned analysis of legislative intent that would support viewing such advice as being covered by the UPA.  *Cf. Grassie v. Roswell Hosp. Corp.*, 2011-NMCA-024, ¶ 85, 150 N.M. 283, 258 P.3d 1075 (recognizing that the application of unfair trade practices laws to legal, medical, and other professionals is limited to entrepreneurial aspects of practices such as advertising, solicitation of business, and billing practices).  The extension of the UPA to cover the tax advice as a "sale . . . of . . . services" goes beyond what the Legislature could have intended.  *See* § 57-12-2(D).

**{29}**    I suspect that a study of case law will indicate that knowingly made misrepresentations[3] relating to securities and to advice given by professionals are more than adequately covered by securities laws and malpractice claims and are not in need of a broadening of the UPA to cover a circumstance like that in the case before us.

**JONATHAN B. SUTIN, Judge**

---

[3]It does not appear that Defendants contested liability on the ground that the misrepresentations were not made "knowingly" and, thus, intentionally under Section 57-12-2(D).